NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210335-U

NO. 4-21-0335

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 4, 2021
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 19JA118 |
| v. | ) | |
| David B., | ) | Honorable |
| Respondent-Appellant). | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1  *Held:*  The appellate court affirmed the trial court's termination of respondent's parental rights because the court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2  Respondent, David B., is the father of L.J. (born May 2019). In May 2021, the trial court found respondent was an unfit parent, and in June 2021, it found termination of respondent's parental rights would be in the minor's best interest. Respondent appeals, arguing that the court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                I. BACKGROUND

¶ 4                             A. Procedural History

¶ 5  In June 2019, the State filed a petition for adjudication of wardship, alleging L.J. was neglected in that (1) her blood, urine, or meconium contained an amount of controlled

substance, being methamphetamines and (2) her environment was injurious to her welfare "as evidenced by [her] mother's drug use." See 705 ILCS 405/2-3(1)(b), (c) (West 2018). Also in June 2019, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6        In September 2019, the trial court adjudicated L.J. a neglected minor.

¶ 7        In October 2019, the trial court conducted a dispositional hearing. The court entered a written order finding that it was in the best interest of L.J. and the public that L.J. be made a ward of the court and adjudicated a neglected minor. The court further found (1) respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor and (2) the health, safety, and best interest of the minor would be jeopardized if the minor remained in his custody. The court placed guardianship and custody with the guardianship administrator of DCFS. The written order also stated, "[T]he Court having admonished the parents that they must cooperate with DCFS, comply with the terms of the service plan, and correct conditions that require the minor to be in care, or risk termination of their parental rights."

¶ 8                    B. The Termination Hearing

¶ 9        In September 2020, the State filed a motion for termination of respondent's parental rights. The State alleged respondent was an unfit parent because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to L.J.'s welfare, (2) make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent within the nine-month period of September 18, 2019, to June 18, 2020, and (3) make reasonable progress toward the return of the child to him within that same nine-month

- 2 -

period. See 750 ILCS 50/1(D)(b), (m)(i), (ii) (West 2020).

¶ 10                                    1. *The Fitness Proceedings*

¶ 11         In April 2021, the trial court conducted the fitness portion of the termination proceedings. At the beginning of the fitness hearing, respondent's counsel requested a continuance because respondent had just started some of his recommended services (drug counseling, parenting classes, anger management) and he had not yet completed them. The trial court denied respondent's motion.

¶ 12                                    a. Michelle Tremain

¶ 13         Michelle Tremain testified that she was employed by DCFS and was assigned L.J.'s case in June 2019. She testified L.J. was born exposed to illegal drugs and was taken into custody shortly after her birth when her mother continued to use drugs. Respondent and L.J.'s mother were not together when L.J. was born. Tremain conducted a diligent search for respondent in July 2019 and learned he was living in Tennessee.

¶ 14         In August 2019, respondent participated in an integrated assessment by telephone. Tremain testified that, in discussing whether drug use was an issue that needed to be addressed, respondent reported that he was on probation and Tremain could "obtain drug drops" from his probation officer. She testified that she asked him for the probation officer's name but he never provided it.

¶ 15         Also in August, Tremain advised respondent that DCFS could provide transportation assistance, such as a bus pass, train ticket, or gas card, for respondent to visit L.J. in Illinois. Respondent advised that he had a warrant but expressed interest in attempting to visit in September.

¶ 16         Tremain established a client service plan for the family and provided respondent a

copy via email. The services that were identified for respondent to complete included parenting classes, domestic violence classes, and participation in visitation. The service plan also required respondent to have stable housing and employment.

¶ 17 In September 2019, Tremain reviewed the client service plan with respondent over the telephone. Tremain testified that she and respondent "reviewed every service that was outlined in his service plan and what the expectations were." Tremain also testified that she did not make referrals for these services because respondent was in Tennessee, and Tremain "[could not] do any kind of referrals outside of the state of Illinois." She explained respondent was responsible for locating services in his area and paying for them.

¶ 18 Also in September 2019, respondent participated in a "child and family team meeting" over the telephone. Tremain testified that she again advised respondent that he was responsible for locating services, paying for services, and signing releases of information so she could get updates and proof that he was engaged in or completed a specific service.

¶ 19 Tremain communicated with respondent by email, phone, or text message "a couple times a month," then the communication "went blank." Knowing respondent had a warrant, she believed "maybe he's in jail." In late November or early December 2019, she learned respondent was incarcerated in the Montgomery County jail in Clarksville, Tennessee. Tremain testified that while respondent was incarcerated, she could not "direct him to any services or help him find services."

¶ 20 In May 2020, Tremain called the jail to attempt to speak with respondent, but the jail did not permit her to do so. In June 2020, while still jailed, respondent wrote to DCFS requesting a copy of the service plan. Tremain's supervisor mailed a hard copy to the jail, but it was returned. Tremain attempted to send the service plan a second time, removing staples and

copying on both sides in the event it was too thick, but it was again returned. Tremain learned that due to the COVID-19 pandemic, the jail only allowed legal mail and it did not consider DCFS documents to be legal documents.

¶ 21        In his June 2020 letter to DCFS, respondent included a birthday card for L.J. This was the only card or letter he ever sent to L.J.

¶ 22        Tremain testified that, from August 2019 to the time respondent went to jail in November 2019, respondent did not contact her to tell her that he started services. When she discussed with him the importance of doing services, he was "largely argumentative," and it appeared to Tremain that he was "unwilling to do services."

¶ 23        Tremain testified that respondent was released from jail in October 2020 and contacted her by phone upon his release. She again discussed with him the services he was required to complete. Tremaine testified that the first time she heard of respondent's engaging in any services was March 2021 (nearly two years after L.J. was taken into care) when she received a call from Centerstone (an agency in Tennessee) stating that respondent had completed an intake appointment for services. Tremain testified that she never received any notification that respondent completed any services.

¶ 24        Tremain further testified that, between September 18, 2019, and June 18, 2020—the nine-month period alleged in the petition—respondent did not cooperate with her. He did not sign releases of information. He did not disclose service providers. He did not complete services. And he did not take her up on her offer of transportation assistance to visit L.J. in Illinois.

¶ 25                        b. Respondent's Testimony

¶ 26        Respondent testified that he resided with his mother and brother in Clarksville, Tennessee, and he had never lived in Illinois. He had been employed full-time as a laborer since

his release from jail in October 2020. Respondent had three children (in addition to L.J.) who did not live with him, but he was a part of their daily lives.

¶ 27      Respondent further testified that he was in a relationship with L.J.'s mother while they were living in Tennessee. When she was five months pregnant, respondent disagreed with her desire to use methamphetamine. When he came home from work one day, she was gone. The next phone call he received was that "she had the baby and lost the baby." Respondent testified that he last spoke with L.J.'s mother in the week before the hearing, and she was not interested in trying to get L.J. back. Respondent then testified, "Now where I'm at, I don't argue the parents to have my daughter now. *** But I don't want to give up my rights."

¶ 28      When asked if he received a copy of service plan, respondent answered, "When everything first started, I got an e-mail, but I don't have a printer or anything. Since then, I just can't recall anything of a plan being put together, and I've asked like what do I need to do or what services or where I need to go[?]" Respondent's counsel then asked him if he recalled ever going over the service plan with his caseworker. Respondent did not offer a clear answer, responding, "Yeah. We have had a lot of conversations. I couldn't tell you yes or no, but I honestly don't believe so. Like[,] talked about it and put it in play[?] [N]o." Respondent then acknowledged being told he needed to do "parenting classes, domestic classes, [and] drug counseling."

¶ 29      Respondent testified he went to jail in late October 2019 for "violation of community corrections." He clarified that his violation was a "[d]omestic charge." (The nature of respondent's underlying conviction is unclear from the record.) Respondent testified that he was currently on probation and expected to be on probation for the next five years. He was taking drug tests and was compliant with probation. Respondent testified that he was restricted by his

probation in Tennessee from leaving the state, but he could leave if he got a "pass" from the judge.

¶ 30 Respondent recalled participating in an integrated assessment and in case review meetings prior to going to jail in October 2019. He testified that he was cooperating as much as he could from where he lived. He acknowledged that he "probably could have done better at the time," but explained he was "kind of hurt given the situation, and I had to apologize to the Court for my stagnation at the beginning."

¶ 31 When asked whether he was able to make any progress or attend services while in jail, respondent answered, "Due to the COVID, they didn't give us any rehabilitation in the jail at all." He wrote his caseworker "several times" asking what he needed to do.

¶ 32 Respondent was released from jail at the end of October 2020. He began taking anger management classes, parenting classes, and drug counseling in February 2021.

¶ 33 Respondent's counsel asked, "You said that you need some time for—to be fit for your child, is that correct?" Respondent answered, "Yes, ma'am." He explained that he wanted to complete all the classes and expressed his belief that he would have stable housing and income around the time he finished his classes. He also stated his desire to be "more stable financially," and to be in a situation where he could "focus on myself, my daughter and the best that I can be to be a good father."

¶ 34 Respondent testified that he had his first Zoom visit with L.J. last week. He testified that he had not been offered visitation before that time. He testified that he explained to Tremain that he was not allowed to leave Tennessee but no alternative for visitation was offered.

¶ 35 On cross-examination, respondent acknowledged that he received a copy of the service plan by email at the beginning of the case and was able to open and view the service

plan. He testified that his incarceration prevented him from doing services prior to February 2021. Respondent agreed that (1) paternity testing established he was L.J.'s father in June 2019 and (2) he was incarcerated in the beginning of November 2019. When asked what prevented him from doing services in June through October 2019, respondent testified that he "actually enrolled and started doing them, but I had the warrants, so I went to jail, and I sat in jail for a year." Respondent testified that he was enrolled in classes at Cornerstone before he was incarcerated but acknowledged that he did not send any releases to his caseworker so she could know what services he was in. He acknowledged that she asked him "several times repeatedly" for releases so she could see what services he was in.

¶ 36                                    c. The Trial Court's Findings

¶ 37            The trial court found that the State had proved by clear and convincing evidence that respondent failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to L.J.'s welfare, (2) make reasonable efforts to correct the conditions that were the basis of the removal of the minor from him within the nine-month period of September 18, 2019, through June 18, 2020, and (3) make reasonable progress towards the return of the minor to him within that same nine-month period.

¶ 38            Regarding services, the trial court found that respondent participated in an integrated assessment and "team meetings" in 2019 during which he was advised to complete services, including "visitation, parenting, employment, stable housing, and [partner abuse] classes." Respondent received the integrated assessment by email, and a copy was also sent by regular mail. Respondent failed to complete any of the recommended services.

¶ 39            Regarding visitation, the trial court found that respondent was offered visitation but never engaged in visitation during the nine-month period alleged in the petition. The court

- 8 -

further found that respondent admitted he did not do what he should have done to have his child returned to him and he needed another six months to be ready for the return of the child. The court concluded that, by respondent's own admission, he was not ready for the return of his child at the time of the parental fitness proceedings.

¶ 40                                  2. *The Best-Interest Proceedings*

¶ 41            In June 2021, the trial court conducted proceedings regarding whether it was in L.J.'s best interest to terminate respondent's parental rights. Respondent was present through his attorney but did not personally attend. Respondent's attorney represented that respondent was aware of the hearing and did not communicate to her his inability to attend.

¶ 42                                  a. Michelle Tremain

¶ 43            Tremain was the sole witness at the best-interest hearing. She testified that L.J. had lived in her foster home since June 2019 and it was the only home she had ever known. She was very bonded to her foster family and received love, affection, and a structured environment. She called her foster parents "momma and dadda." Three other children lived in the home—two previous foster children, whom the foster parents had adopted, and another foster child. L.J. had been discharged from occupational therapy while living in her foster home, and she received routine medical care and education through day care. L.J.'s foster parents had stated their commitment to adopt L.J.

¶ 44            Tremain further testified that L.J. had only one video chat with respondent, which occurred in April 2021, and that L.J. had never been physically present with respondent.

¶ 45                                  b. The Trial Court's Findings

¶ 46            The trial court found that it was in L.J.'s best interest to terminate respondent's parental rights. The court stated the following:

"Of particular importance to the Court is the bonding and the receipt of love and affection by the minor, a structured environment, where developmental milestones are met, where there are other children of a similar nature in the home that have been adopted[.] *** I can't really think of a better placement for this child than what the caseworker has described for the Court, and their adoption commitment seems to be genuine and well-defined."

The court weighed these considerations against the "lack of contact or interest by [respondent]" and terminated respondent's parental rights.

¶ 47   This appeal followed.

¶ 48           II. ANALYSIS

¶ 49   Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm.

¶ 50        A. The Fitness Determination

¶ 51   Respondent argues the trial court's findings that he failed to maintain a reasonable degree of interest, concern, or responsibility and failed to make reasonable efforts or reasonable progress were against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's finding that respondent failed to make reasonable progress within the applicable nine-month period was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 52                    1. *The Applicable Law and Standard of Review*

¶ 53        The State must prove unfitness as defined in section 1(D) of the Adoption Act

(750 ILCS 50/1(D) (West 2018)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939,

¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a

parent who fails to make "reasonable progress toward the return of the child" during any

nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West

2018). Reasonable progress is an objective view of the steps the parent has taken toward the goal

of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*, 2021

IL App (4th) 200658, ¶ 51. "At a minimum, reasonable progress requires measurable or

demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d

1052, 1067, 859 N.E.2d 123, 137 (2006). Additionally, the Illinois Supreme Court has held, "the

benchmark for measuring a parent's 'progress toward the return of the child' under section

1(D)(m) of the Adoption Act encompasses *the parent's compliance with the service plans*."

(Emphasis added.) *In re C.N.*, 196 Ill. 2d 181, 216, 752 N.E.2d 1030, 1050 (2001).

¶ 54        A determination of parental unfitness involves factual findings and credibility

determinations that the trial court is in the best position to make because "the trial court's

opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.)

*In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will

not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939,

¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is

clearly apparent. *Id.*

¶ 55                            2. *This Case*

¶ 56        Respondent argues the evidence presented at the fitness hearing demonstrates that

he made reasonable progress during the applicable nine-month period because he completed the only service available to him: he cooperated with DCFS. Respondent contends that no other services were made available to him and he was unable to participate in services while he was incarcerated.

¶ 57 Regarding respondent's cooperation, Tremain testified that respondent participated in "child and family team meetings" at an unspecified time in September 2019. Tremain reviewed the service plan with respondent and emailed him a copy. Respondent provided evasive answers when asked whether he received the service plan and knew its contents, but he eventually acknowledged that he knew he was required to complete parenting classes, domestic violence classes, and drug counseling. Respondent never provided Tremain with releases so she could monitor his progress in services, despite her repeated requests. Tremain testified that respondent was argumentative and demonstrated an unwillingness to do services. Her testimony was corroborated by respondent's acknowledgement that he was "hurt" and "could have done better," along with his apology to the court for his "stagnation."

¶ 58 Further, the evidence demonstrates, and respondent acknowledges, that he did not complete any of the other recommended services within the nine-month period alleged in the petition. Respondent did not begin any services until February 2021 and had not completed any by the time of the fitness hearing. He participated in one video visit with L.J. the week before the fitness hearing.

¶ 59 The State correctly notes that "[t]he law does not afford a parent an unlimited period of time to make reasonable progress toward regaining custody of the [child]." *In re Davonte L.*, 298 Ill. App. 3d 905, 921, 699 N.E.2d 1062, 1072 (1998). Moreover, "[t]ime in prison is included in the nine-month period during which reasonable progress must be made."

*In re F.P.*, 2014 IL App (4th) 140360, ¶ 89, 19 N.E.3d 227.

¶ 60        As the Illinois Supreme Court has held, the "benchmark" for assessing reasonable progress is "the parent's compliance with the service plan." *C.N.*, 196 Ill. 2d at 216-17. Here, respondent knew what the service plan required of him and he did not complete any portion of it. The recommended services were necessary for DCFS to ensure that L.J. could be safely placed with respondent. Parenting classes were necessary because respondent had never parented L.J. Domestic violence classes were necessary because respondent had a history of domestic violence. Visitation was necessary because respondent had never met L.J.

¶ 61        As of June 18, 2020—the end of the nine-month period alleged in the petition— having made no progress in any of those services, respondent was no closer to having L.J. returned to him than he was at the initiation of the case. Accordingly, we conclude that the trial court's finding that respondent was unfit because he failed to make reasonable progress toward the return of L.J. to him during the nine-month period of September 18, 2019, through June 18, 2020, was proper.

¶ 62                    B. The Best-Interest Determination

¶ 63                    1. *The Applicable Law and Standard of Review*

¶ 64        At the best-interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's
> identity; (3) the child's familial, cultural[,] and religious background and ties;

(4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

See also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 65 A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 66                                     2. *This Case*

¶ 67 Respondent argues the evidence was insufficient to justify termination of his parental rights. He contends that termination was not warranted because the evidence demonstrated the possibility of a relationship between L.J. and respondent and her return to him in an intact family unit where he could provide for her physical and emotional needs.

¶ 68 The evidence presented at the best-interest hearing demonstrated that L.J.'s foster home is the only home she has ever known. Her foster parents provide her a loving, stable home where her social, educational, and developmental needs are met. Her foster parents have

previously adopted two children and are fostering a third. They have committed to adopting L.J. L.J. is bonded to her foster parents and siblings and receives affection and comfort from them.

¶ 69　　　　In contrast, L.J. has never met her father in person and has had only one visit with him by video.

¶ 70　　　　Accordingly, we conclude the trial court's finding that termination was in L.J.'s best interest was well supported by the record.

¶ 71　　　　　　　　　　　　　III. CONCLUSION

¶ 72　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 73　　　　Affirmed.